**UNITED STATES of America, Plaintiff,**

v.

**Booker T. DUKE, a/k/a Smitty Jimmie Lee Stanback, Defendants.**

**No. IP 66–CR–133.**

United States District Court
S. D. Indiana,
Indianapolis Division.

Feb. 9, 1967.

---

Richard P. Stein, U. S. Atty., by James Manahan, Asst. U. S. Atty., for the United States.

Robert H. VanBrunt, and Paul H. Frazier, Indianapolis, Ind., for defendants.

ENTRY

STECKLER, Chief Judge.

Each of the defendants in this cause has alleged that the indictment herein was returned by a Grand Jury which was constituted illegally in that the following groups were excluded from consideration for jury service either in whole or in part: (1) Negroes, (2) Young Adults, (3) Persons With Low Incomes, (4) Women, (5) Political Groups, (6) Geographic Groups, (7) Religious Groups, and (8) Persons who do not happen to be acquainted with a juror suggestor.

██ The defendants' allegations concerning Group 7 arise from the fact that in this District jurors have been obtained in large part by the juror-suggestor or so-called "key-man" system. Under this system, the Clerk and the Jury Commissioner communicate with suggestors throughout the District by mail and request that they recommend persons as prospective jurors. With few exceptions these juror suggestors are county clerks, county assessors, postmasters or school superintendents.

The Clerk and Jury Commissioner's letter which is sent in normal course reads as follows:

Dear

The right of a trial by jury is one of our most cherished democratic traditions; however, this right can be a meaningful one only if jurors are capable and impartial and are selected without out regard to race, color, creed, politics or station of life. We, as jury commissioners for the Federal Court at Indianapolis, are charged with the duty of getting jurors of this kind.

Because such jurors should be drawn from all parts of the large area served by the Indianapolis seat of court and should represent all walks of life and points of view, we need the help of conscientious and well informed citizens in properly discharging this obligation. That is why we are calling upon you to suggest the names of men and women in your community who, in your judgment, would make qualified jurors. It is because we feel that you are in a position to know citizens who measure up to the standards of good jurors that we are writing you.

For your convenience we are enclosing a sheet on which to list your candidates. In making your suggestions please refer to the statutory requirements set forth on the attached sheet. Naturally, your suggestions will be kept in strictest confidence. Although we do not want you to act hastily in the important task of preparing your list, we ask that you return it promptly.

Believe us, your help is urgently needed. Your only reward will be the knowledge that you have made an important contribution to the better functioning of a vital democratic institution. We are sure that for you this will be reward enough.

As the form letter itself states, a copy of Title 28, United States Code, Sections 1861 and 1862 was enclosed with each letter and the suggestors were thus advised as to the statutory qualifications and exemptions for federal jurors.

Also enclosed with the aforesaid form letter were two page forms consisting mostly of blank lines with the following two paragraphs appearing at the top of the first page:

I consider the following named persons qualified and not exempt as jurors.

(See Qualifications and Exemptions on Sheet Attached.)

Please print First Name, Middle Initial, Last Name, Complete Address, and Occupation, like example following:

415 E. 5th St.
John W. Jones Bloomington Teacher

This text was followed by thirty blank lines and a space for the signature and address of the suggestor.

A very substantial majority of the jurors who have served in this District in recent years were selected from lists provided by juror selectors who returned the above-described form to the Clerk's office through the mails. A few juror suggestors communicated with the Clerk or the Jury Commissioner verbally and submitted written lists. In these instances, the Clerk or the Jury Commissioner personally informed the suggestors of the statutory qualifications and exemptions and gave them instructions not at variance with the advice given in the above-quoted form letter. In addition to the suggested jurors, the names of a small percentage of the jurors who have served in this District were taken at random from city directories and telephone directories by the Clerk or his deputies. When names were obtained in this manner, it usually was under emergency conditions resulting from an insufficient number of names being obtained through the normal system. The Clerk testified that when names were obtained in this manner, no heed was paid to the income or social status of the person thus picked as it was reflected by his address or to the nationality of such persons as reflected by their names.

With respect to the seventh of the above-listed allegedly excluded groups, there can be no question that all persons who did not happen to be acquainted with those persons who happened to be selected as juror suggestors were, for all practical purposes, effectively precluded from jury service. This, of course, would be the case with any "key-man" or juror suggestor system and this alleged exclusion or preclusion presents the legal question of whether the "key-man" or juror suggestor system is illegal per se. This question will be disposed of in the conclusions of law which appear hereafter.

With respect to the other six of the seven allegedly excluded groups, more complex questions of fact are presented. Under recent case decisions in the Fifth Circuit which will be discussed hereafter, it appears that a jury selection system must be subjected to scrutiny on more than one level and that proof that the jurors actually selected constitute a substantial cross-section of the community will not suffice to establish the legality of the system. It also must appear that the system is calculated in its design to produce a juror list which constitutes a cross section of the community and that where jurors are recommended instead of drawn at random, it must appear that the suggestors as a whole are acquainted with a cross section of the community. Thus the Court must consider the evidence as it reflects upon each allegedly excluded group with respect to each of the three above-recited criteria.

On the question of whether the juror selection system in this District is calculated in its design to obtain a jury list constituting a cross section of the community, the only evidence pro or con appears in the above-quoted Clerk and Jury Commissioner's letter which was used to procure a substantial majority of the jurors who have sat in this District. Although this letter explicitly states that jurors are to be selected "without regard to race, color, creed, politics or station of life" and that they should "represent all walks of life and points of view" the Defendants have urged that the words and phrases "capable and impartial" jurors, "good jurors," and "in your judgment would make qualified jurors" are calculated to result in the selection of an elite group to serve on our juries.

In the evidence in this cause, the Court has before it the narrative summary of seventy-nine interviews of juror suggestors. Not one of these interviews even suggests that any of the jury selectors were in any way led to disregard the fed-

eral jury statutes which were enclosed with the letter by anything to be found in the text of the letter. But even with the assistance provided by the aforesaid interviews, the Court cannot read the minds of the juror selectors and the best evidence as to whether they were improperly influenced by the letter they received is to be found in a study of a cross-section of the jurors which the suggestors recommended. The Court finds nothing overtly unlawful in the letter which the Clerk and Jury Commissioner sent to the selectors and it will conclude that the jury selection system in this District has been lawful in its design unless it appears that there has been some exclusion in fact.

With respect to the question of whether the juror selectors as a whole were sufficiently acquainted with members of the groups who allegedly were excluded, and with respect to the question of whether the jurors actually selected constituted a cross section of the community, no blanket finding can be made and separate findings must be made with respect to each allegedly excluded group.

A questionnaire which the government mailed to the one hundred forty juror selectors whose names appeared in the Clerk's files for the past three years and which was responded to by ninety seven of the selectors indicated that 76% of the selectors had a speaking and/or nodding acquaintance with at least one Negro. Only four of the remaining 24% or approximately 5% of the suggestors came from counties where the 1960 census figures indicated that more than one half of one percent of the county population was Negro. On this basis, the Court finds that 95% of the suggestors were acquainted with Negroes or they were from areas where the percentage of Negro population was so small that they couldn't necessarily be expected to be acquainted with any Negroes.

The Defendants' own evidence established that the adult population of the Southern District of Indiana is 4.87 Negro insofar as the 1960 census figures reflect. The plaintiff presented evidence from the same census figures to the effect that Negroes constitute only 4.17% of the adult population of the Southern District of Indiana which has a seventh grade or higher educational background. The plaintiff also presented the testimony of the three room clerks for the judges of this Court who were sitting during the past three years. These room clerks attested to the number of petit jury venires they had witnessed during the two years preceding the filing of the defendants' motion, the average number of jurors who appeared in court on each venire and the total number of individual Negroes whom each of them positively could recall seeing on petit jury venires.

■■ On the basis of the aforesaid testimony, the Court now finds that at least 5.03% of the jurors who are summoned and actually appear for service in this District are Negroes, that Negroes constitute 4.87% of the adult population in this District and that Negroes constitute only 4.17% of the functionally literate adult population in this district. The uncontradicted evidence further showed and this Court judicially knows that the grand jurors are drawn from the same source as the petit juror panels in all four divisions of the district and on this basis, the Court further finds that the foregoing statistics apply to the list from which the grand jury under attack was drawn.

■ The Defendants' allegation that young adults have been excluded from jury service has not been supported by any evidence. The plaintiff has presented evidence that the average age of the grand jurors who returned the indictment and the members of the two preceding grand juries was 48.44 years and there also has been evidence that there is an average lapse of one year between the recommendation of a juror's name and the drawing of his name from the wheel. The uncontradicted evidence also has shown that the average age of adults in this state is 46.5 years and on the basis of the foregoing figures, the Court finds that the average age of recommended jurors in this district is less than one

year greater than the average age of adults in this district.

The defendants presented no evidence in support of their allegation that persons of low income were being excluded from jury service other than the testimony of attorneys who were experienced with state and federal juries and who gave highly speculative testimony to the effect that federal jurors in this district were of a "better quality" than state jurors. The plaintiff responded with evidence arising from the questionnaire which was answered by ninety seven selectors and from the census figures viewed in conjunction with the records of the Clerk.

In the plaintiff's questionnaire, the juror suggestors were asked to state whether they had a speaking and/or nodding acquaintance with and knew the name of at least one person who belonged to each of the groups appearing on the following table. The percentage figures which appear on this table constitute the percentage of suggestors who did have such an acquaintance with at least one member of the listed groups.

| | | | |
|---|---|---|---|
| Republicans | 95.5% | Persons with twice your | |
| Office Workers | 95.5% | income | 82.0% |
| Protestants | 95.0% | Skilled Laborers | 81.0% |
| Teachers | 95.0% | Negroes | 76.0% |
| Owners of Small Business | 95.0% | Office Managers | 76.0% |
| | | Waiters | 74.0% |
| Democrats | 93.0% | Engineers | 74.0% |
| Catholics | 93.0% | Deliverymen | 72.0% |
| Persons with half your | | Farm Laborers | 72.0% |
| income | 87.5% | Foremen | 69.0% |
| Carpenters | 91.0% | Machinists | 67.5% |
| Farmers | 87.5% | Jews | 66.0% |
| Salesmen | 87.5% | Bartenders | 58.0% |
| Gas Station Attendants | 87.0% | Hotel Managers & | |
| Barbers | 86.0% | Clerks | 54.0% |
| Janitors | 86.0% | Bus or cab drivers | 43.0% |
| Factory Workers | 84.0% | Garbage collectors | 42.5% |
| Store Clerks | 84.0% | Guards | 40.0% |
| Nurses | 83.0% | Hotel Workers | 39.5% |
| Construction Workers | 83.0% | Persons of no religion | 24.3% |
| Mechanics | 82.0% | Porters | 15.5% |

It appears that 95.5% of the suggestors indicated their acquaintance with office workers while only 76.0% of them indicated their acquaintance with office managers, that 84.5% indicated their acquaintance with factory workers and 81.5% indicated their acquaintance with skilled workers but only 69.0% indicated their acquaintance with foremen and that 86.0% indicated their acquaintance with janitors but only 65.0% indicated their acquaintance with engineers. On the basis of the foregoing, the Court finds that the juror suggestors were sufficiently acquainted with a socio-economic cross-section of the community to render them capable of suggesting jurors who constitute such a cross-section. From this alone, of course, it does not follow that jurors who have been recommended constituted such a cross-section in fact.

This Court knows from its experience with venires and it does not appear to be disputed that the social and economic attributes of jurors who have appeared in this Court are many and varied. But this does not militate against the defendants' essential argument that while

834

the jurors come from all socio-economic stati, they represent, on the whole, the higher echelons of the community as opposed to the lower.

Drawing from the census figures and from the records of the Clerk, the plaintiff has presented evidence showing that the approximate statistical average income of workers of all ages in the state of Indiana is $4,100 while the approximate statistical average income of jurors in this district is $5,100 (with 1960 census figures being used in both cases.) This would indicate a twenty percent deviation between the average income of jurors and the average income of wage earners. But then, when a mathematical adjustment is made to exclude wage earners who are not adults, the plaintiff's evidence has shown that the statistical average wage of adults in this state is within ten percent of the statistical average wage of jurors. The plaintiff has further argued that if it were possible to consider other factors, it would appear that there is no deviation between the average income of jurors and wage earners. These factors include the plaintiff's suggestion that if the incomes of illiterates, felons and other persons who are excluded from jury service by statute were to be abstracted from the adult wage earners average income figure, the aforesaid deviation would dwindle to zero.

█ On the basis of the foregoing, the Court finds that the jurors selected in this district do constitute a substantial socio-economic cross-section of the community.

█ In support of their allegation that women are excluded from jury service in this district, the defendants have presented the testimony of various attorneys and other persons who have observed proceedings in the federal courts of this District for a number of years. All of these witnesses testified that male jurors substantially outnumber female jurors but all of them further testified that they could not remember a single venire which did not contain members of both sexes and they could recall very few occasions when an all male petit jury was seated

after the exercise of peremptory challenges by counsel. The seventy-nine interviews of juror-suggestors which were submitted in evidence show that only two of them regarded women as inferior jurors and that while only five of the seventy-nine suggestors were women, two of the women suggestors failed to name any women. On the basis of the foregoing, the Court finds that there is nothing in the design of the jury system in this district which is calculated to exclude women. The Court further finds that the jury list does not contain a statistical cross-section from the standpoint of sex, but that both sexes are represented substantially. By "substantially represented" the Court means that it is very unlikely that a verdict would be rendered in this district without members of both sexes having an opportunity to influence the result. It must be kept in mind, of course, that the exercise of peremptory challenges during a voir dire can result in the exclusion of any given group in a given trial but it also must be kept in mind that the presence of members of an unwanted group in the venire will result in the exhaustion of a party's peremptory challenges and this in turn will have an ultimate influence on the verdict. This is not to say that the token presence of women on every venire would constitute sufficient representation. The Court finds that there has been substantially more than mere token representation of women on the juries in this district.

█ As to the defendants' allegations pertaining to the claimed exclusion of Political Groups, Geographic Groups and Religious Groups, there has been no evidence of such probative value as to merit discussion or findings.

In view of the foregoing evidence, the Court concludes as a matter of law that the jury list from which the grand jurors who returned the indictment in this cause were drawn and selected contained the names of prospective jurors who represented a sufficient cross-section of the community to satisfy the legal requirements of Title 28, United States Code,

Section 1861 under every judicial interpretation of that statute which has been brought to this Court's attention. This Court specifically has considered the recent decision in Rabinowitz v. United States, 366 F.2d 34 (5th Cir. 1966) which has been the mainstay of the defendants' legal theory.

In the *Rabinowitz* case, the Fifth Circuit declared an indictment illegally returned where it appeared that the jury list contained only 5.8% Negroes while the percentage of Negroes in the adult population of the division from which the jurors were drawn was 34.55%. In addition to this holding, four of the eight judges who participated in the *Rabinowitz* decision concurred in a lengthy and elaborate opinion which the defendants have interpreted to have the following meaning:

1. The Jury Commissioner and Clerk who are the only persons entrusted with the statutory duty of obtaining jurors must not establish or invite the establishment of one or more standards or qualifications other than those standards or qualifications specifically enumerated in Title 28, U.S.Code, Section 1861.

2. If the Jury Commissioners delegate their authority to key-men in whole or in part, these key-men must not employ standards which are in addition to those prescribed by Title 28, U.S.Code, Section 1861, because this constitutes an exclusion per se of those persons who make up the statutorily qualified pool and who have an absolute right to serve on juries.

3. The prospective jurors selected by the jury commissioners and/or key-men must represent a fair cross-section of the population of the particular district in which the court sits even if the jury commissioners and the key-men do not establish standards of qualifications in excess of Title 28, U.S. Code, Section 1861.

The defendants have urged that the jury system in this district violates the first of the above-quoted criteria which they find in the *Rabinowitz* decision because the letter which the Jury Commissioners sent to the juror suggestors asked them to use their own judgment and suggest "good" jurors. The defendants have further urged that the system in this district violates the second of the above-quoted criteria which they find in the *Rabinowitz* decision because the suggestors considered such things as "intelligence" and "common horse sense" and these "qualifications" are not mentioned in Title 28, United States Code, Section 1861 and because the suggestors suggested only persons they knew and "knowing a suggestor" is not mentioned in the statutory qualifications.

 This Court will not presume to render an authoritative interpretation of the four-judge opinion of the Court in the *Rabinowitz* case as that opinion can speak for itself and it speaks for itself very explicitly in footnote 32 (366 F.2d 51) where it states that it is not to be construed as opposite to the opinion of the Court of Appeals of this Circuit in United States v. Henderson, 298 F.2d 522 (7th Cir. 1962) which reads in pertinent part as follows at page 525:

"Recognition that the statute envisions 'efficient' service requires rejection of a conclusion that an intelligence level equated with mere literacy was intended to be imposed as a maximum standard to be employed by the clerk and the commissioner in the selection of persons pursuant to § 1864 whose names are to be placed in the box from which jurors are drawn.

"And this view of the statute not only is in accord with its express provisions but is in harmony with the observation in Brown v. Allen, 344 U.S. 443, 474, 73 S.Ct. 397, 416, 97 L.Ed. 469 that no due process infirmity invalidates a jury source which 'reasonably reflects a cross section of the population suitable in character and *intelligence* for that

civic duty' ". (Emphasis supplied by the Seventh Circuit.)

In view of the *Henderson* decision and footnote 32 of the four-judge opinion in the *Rabinowitz* case, this Court can only conclude that the fact that the juror suggestors in this district have considered "intelligence" and "common horse-sense" and other personal qualities not related to race, politics, socio-economic status, age or sex does not militate against the legality of the jury system in this district when judged in the light of the said four-judge opinion. For the same reason, the Court concludes that there is nothing illegal in the design of the jury system in this district arising from the fact that the Commissioners' letter asked the suggestors to use their own judgment and suggest good jurors.

It also should be noted that the four-judge *Rabinowitz* opinion upon which the defendants rely was not joined in total by a majority of the court and the special-concurring opinion of Judge Brown must be considered in determining the import of the *Rabinowitz* decision. Judge Brown's opinion reads in pertinent part as follows:

> "In order to avoid a 4–to–4 deadlock and the unfortunate predicament of a Court being unable authoritatively to decide a case, (citing cases) I cast my vote, weak as it is, for the thesis developed at such length that Congress *intended* the 1957 Amendments to be, not the minimum, not the maximum, but the sole standard of jury selection."

Rabinowitz v. United States, 366 F.2d 34, 72 (5th Cir. 1966)

> "At every step, therefore, there is a continuing demand for selective judgments. While in making them it may be assumed that as to individuals chosen they are required nominally to have only the qualifications prescribed in the 1957 Act, the fact is otherwise. To those must be added all of the other measuring tests to assure the fair community cross section. This means that whatever Congress might have thought it was doing, it did not, it could not,

dispense with these additional judgmental standards by which out of hundreds of thousands, or occasionally a million or more names, the very, very tiny group comprising the box is selected.

> \* \* \* \* \* \*

> "There is a place therefore—indeed, the Constitution assures a place—for levels of intelligence above the marginal minimum literacy test. Thankfully, the Constitution rescues the judicial structure from the ironic assumption that the law cannot search for or try to get the sort of intellectual preparation for deciding today's complex controversies."

Rabinowitz v. United States, ibid at pgs. 73, 74

At the end of the above-quoted portion of Judge Brown's opinion he cites in a footnote the following portion of the 1959 Report of the Judicial Conference Committee on the Operation of the Jury System:

> "In order that grand and petit jurors who serve in United States district courts may be truly representative of the community, the sources from which they are selected should include all economic and social groups of the community. The jury list should represent as *high a degree of intelligence, morality, integrity, and common sense as possible.*" (Judge Brown's Emphasis)

■ This is not to say that juror suggestors may exclude racial or other groups under the pretext of considering "intelligence, morality, integrity, and common sense." Any outright equation of "intelligence" with a higher education or wealth, of "morality" with a specific religious persuasion, of "integrity" with political persuasion or of any other personal attribute with membership or non-membership in a cognizable group would constitute a deviation from the spirit of the statute. In view of this, the Court has studied carefully the seventy-nine interviews of juror suggestors which have been submitted in evidence and it

finds no such illegal equation in the minds of the juror suggestors. While some suggestors spoke of "education", it was clear that most of those who considered this factor suggested several persons with less than a high school education and of those who spoke of considering intelligence made it clear by other statements that education was not the sole criterion for such consideration. While a substantial percentage (but not a majority) of the suggestors stated that they selected "outstanding citizens" and a few stated that they selected "prominent citizens", they also made it clear that these outstanding and prominent citizens included carpenters, filling station attendants and persons from all walks of life. Space will not permit a detailed summary of these interviews, and the Court necessarily must be anecdotal in recording its impression resulting from its study of these interviews. Suffice it to say that the Court concludes from the evidence before it that the juror suggestors in this district, the vast majority of whom are elected public officials or public administrators, have demonstrated that adherence to democratic ideals which is to be expected of them in their public functions and the cross-section of the community which has been achieved by their suggestions redounds to their personal credit.

The only question which remains is that of whether there is any illegality to be found in the fact that qualified citizens necessarily were precluded from consideration if they were not known to juror suggestors. As the Court has noted before, this particular theory of the defendants amounts to saying that the juror suggestor or "key-man" system is illegal per se. In disposing of this question, it need only be noted that the 1959 Report of the Judicial Conference Committee on the Operation of the Jury System noted the widespread use of the "key-man" system and found it acceptable:

"The key-man system is the most widely used and if the key-men are selected with discretion and a view of securing diversification, it is productive of generally good results."

26 F.R.D. 470.

In view of the foregoing, the Court concludes as a matter of law that the juror selection system used in this district is not illegal in its design, its execution or its results. In so concluding, the Court does not say that the system is perfect or even near-perfect or that a better system might not be devised. Advances in the fields of sociology, demography and other technologies might well make it feasible to have a completely random system of juror selection while the ever-increasing work load of this Court and the concomitant need for a greater and greater number of jurors together with the gradual alienation of individuals and the decreasing number of persons acquainted with a cross-section of the community which may well be resulting from the constantly increased mechanization of our civilization might well render the juror-suggestor system impractical in the future. The Court recently has recommended that the Jury Commissioners consider some possible changes in the system of juror selection, but this recommendation results not from past or present circumstances, but from what the future is likely to bring. The recent addition of another judge to this Court is one of many factors that may result in a change in the system in the very near future and such changes are in no way to be construed as an adverse judgment upon the system we are leaving behind. As of the time of the rendering of this decision, the evidence before the Court shows clearly that the present system is well within all of the Constitutional and statutory requirements.