UNITED STATES of America

v.

Clifton M. BRYANT and Albertina B. Bryant.

UNITED STATES of America

v.

Benjamin M. BUTERA.

UNITED STATES of America

v.

John Stobie ROGERSON.

UNITED STATES of America

v.

David Arthur MOUNCE.

UNITED STATES of America

v.

William TOMAH.

Crim. Nos. 68–11 S. D., 68–12 S. D.; 5235 N. D., 5236 N. D. and 5238 N. D.

United States District Court
D. Maine, S. D.

Oct. 11, 1968.

Lloyd P. LaFountain, U. S. Atty., Edward G. Hudon, Asst. U. S. Atty., Portland, Me., Marshall T. Golding, Appellate Section, Criminal Division, Department of Justice, Washington, D. C., for plaintiffs.

Roger A. Putnam, Howard H. Dana, Jr., Portland, Me., Gerald E. Rudman, Gene Carter, Lewis V. Vafiades, Albert H. Winchell, Jr., Bangor, Me., for defendants.

## OPINION AND ORDER
## OF THE COURT

GIGNOUX, District Judge.

In these five criminal cases, consolidated for the purpose of determining the present motions, defendants have moved to dismiss the indictments on the ground that they were returned by grand juries constituted in violation of the laws and Constitution of the United States. Relying primarily on principles said to be announced in Rabinowitz v. United States, 366 F.2d 34 (5th Cir. 1966), defendants contend specifically that the grand juries which indicted them were drawn from jury pools which were unrepresentative of the total community with respect to age, sex, geographical distribution and educational attainment.[1]

---

1. In the two Southern Division actions, Criminal Nos. 68–11 and 68–12, defendants Bryant were indicted by the Southern Division grand jury on March 14, 1968, for violations of 26 U.S.C. § 7201 (1964) (attempt to evade or defeat in-

Under attack is the so-called "key man," or suggestor, system which has been used for a number of years in selecting jurors to serve on the grand and petit juries in this Court.

Upon the filing of their motions, counsel for defendants were given the opportunity to examine the records of the Clerk and the Jury Commissioner since 1960, including the questionnaires returned by prospective jurors, and also to interview the Clerk.[2] An evidentiary hearing was then held at which the Clerk testified as to the method of jury selection in use at the relevant times, and defendants also presented two expert witnesses, a professor of political science and a "behaviorist," who had collaborated on a statistical analysis of several demographic variables in the jury pools from which were drawn the grand juries which returned these indictments.

The jury pools involved were constituted in January 1963.[3] In selecting the members of the pools, the Clerk and the Jury Commissioner used the "key man" system, and conscientiously followed the jury selection procedures recommended in the 1960 Report of the Judicial Conference Committee on the Operation of the Jury System, which was approved by the Conference in September 1960. 26 F.R.D. 409 et seq. (1960). The following procedures were used:

(1) After taking the matter up with the Court, the Clerk and Commissioner decided approximately how many names should be placed in the jury pool for each Division.[4] The Clerk testified that the number to be selected from each community was then determined in the following manner:

We used the Maine Register to find the total number of polls in every city, town and plantation in each of the two divisions in this District. By dividing the number of names desired in each division into the number representing the total polls of that division, we found a factor which we then used. My recollection is that the factor in the Southern Division was 275 which meant that we would include in the jury wheel the name of one juror for every two hundred seventy-five persons listed in the polls for that community or any major portion thereof. Because of the fractional portions involved, the final number of names placed in the wheel varied slightly from the number originally desired.

(2) The names of the "key men" from each community were obtained from the current Maine Register. In most instances the town clerk was chosen, but if more than four or five names were being requested from a particular community, additional key men were selected from among the town manager, town treasurer, selectmen, and in some cases, the superintendent of schools, the postmaster or a minister. Sex was not a factor in the selection of key men, and approximately one-third of those chosen were women. In only a few instances was either the

come tax) and 26 U.S.C. § 7206(1) (1964) (willfully making fraudulent return), and defendant Butera for violation of 26 U.S.C. § 7201 (1964) (attempt to evade or defeat income tax). In the three Northern Division actions, the indictments were returned by the Northern Division grand jury on April 10, 1968. In Criminal Nos. 5235 and 5236 defendants Rogerson and Mounce were indicted for violation of 26 U.S.C. § 4744(a) (2) (1964) (illegal transportation of marihuana); and in Criminal No. 5238 defendant Tomah was indicted for violation of 50 App. U.S.C. § 462 (1964) (failure to report for induction into the armed forces).

2. It was not possible to interview the Jury Commissioner since he died prior to the filing of the present motions.

3. The Clerk testified that it was the usual practice to select new jury pools every third or fourth year, but that the reconstitution of these pools had been delayed in anticipation of the enactment of the Jury Selection and Service Act of 1968, Act of March 27, 1968, Pub.L. No. 90–274, § 101, 82 Stat. 53.

4. Approximately 1700 names were determined to be needed, 900 names for the Southern Divison pool and 800 names for the Northern Division pool.

Clerk or the Commissioner personally acquainted with a key man.[5]

(3) Each key man was asked by letter to recommend four or five qualified prospective jurors from his community.[6] The letter utilized in communicating with the key men merely set forth the statutory eligibility requirements.[7] Unlike the form of key man letter suggested in the 1960 Judicial Conference Report, it did not request the selection of persons of "fair education," "intelligence," "good character," or high community "esteem." See 26 F.R.D. at 513–514.

(4) Except where a key man recommended more than five names or recommended someone in his late seventies or over, in which case the Commission felt that the individual might well be physically unable to serve when called, each recommended juror was sent a questionnaire requesting information relative to age,

education, occupation, marital status, residence, citizenship, prior jury service, criminal record, English language literacy and any disability. He was also asked to list any objections he might have to serving on a jury. The questionnaire used was a printed form furnished by the Administrative Office of the United States Courts and was the same as the form attached as Exhibit 1 to the 1960 Judicial Conference Report. See 26 F.R.D. at 507–508.

(5) When the questionnaires were returned, the Clerk and the Commissioner eliminated the names of those prospective jurors who were not qualified for jury service under 28 U.S.C. § 1861 (1964), who were exempt from jury service by reason of 28 U.S.C. § 1862 (1964), or who were members of a class which had been excluded from service as jurors by Court order pursuant to 28 U.S.C. § 1863(b) (1964).[8] The Commission then

---

5. The Clerk testified:

I should add that there were a very, very few exceptions where the Jury Commissioner and I, or either one of us, may have known a few individuals. The Jury Commissioner knew some people in Scarborough. I recall one man that he worked with whom he knew in Bangor whom I happened to know with a C. M. Rice Company, whatever it was, where it was not anyone from the Register or an official, but generally speaking, it was city or town officials.

6. The Clerk testified that he and the Commissioner followed the practice of asking for nearly double the number of names needed from each community. The reason for the excess was the near certainty that some of the prospective jurors suggested would be unqualified, exempt or excused, either by law, court order, or for a valid hardship reason.

7. The full text of the letter mailed to key men was as follows:
Dear
We are writing to you at this time to request your cooperation by submitting the names of _____ men and women residing in _____ as prospective jurors for service in the United States District Court for the District of Maine.
Any citizen of the United States who is at least 21 years of age, and who has resided in Maine for a period of one year, is competent to serve as a juror

in this Court, unless he has been convicted of a crime punishable by imprisonment for a period of more than one year and his civil rights have not been restored by pardon or amnesty; or is unable to read, write, speak and understand the English language; or is incapable, by reason of mental or physical infirmities to render efficient jury service.
Will you please fill in the names of qualified men and women residing in your town upon the enclosed sheet, giving the correct address and occupation, and approximate age of each, and return same in the enclosed envelope, which requires no postage.
Your prompt attention to this matter will be greatly appreciated.

Sincerely yours,
Jury Commissioner
Clerk, U. S. District Court

8. The cited sections provide:

§ 1861. Qualifications of Federal jurors
Any citizen of the United States who has attained the age of twenty-one years and who has resided for a period of one year within the judicial district, is competent to serve as a grand or petit juror unless—
(1) He has been convicted in a State or Federal Court of record of a crime punishable by imprisonment for more than one year and his civil rights have not been restored by pardon or amnesty.

proceeded to "weed out" those who appeared to be too old or in bad health, and those, such as mothers of young children and sole proprietors of businesses, to whom jury service would represent a substantial personal or economic hardship. Of the remaining names, in the words of the Clerk:

> The decision as to what names would be accepted was made by the jury commissioner and by me, and was based upon a number of considerations. It might be because of age; attempting to maintain some sort of balance between men and women, as for example, when four key men were contacted in a community and two or three submitted the names of only men, we would be more likely to select the women on the remaining lists; occasionally to try to maintain some balance so that a particular profession or occupation would not be overly represented; etc.

(6) The names finally chosen were placed in the jury wheels from which the jury panels for each Division were drawn at random in open court as needed.[9]

(2) He is unable to read, write, speak, and understand the English language.

(3) He is incapable, by reason of mental or physical infirmities to render efficient jury service.

§ 1862. Exemptions
The following persons shall be exempt from jury service:

(1) Members in active service in the armed forces of the United States.
(2) Members of the Fire or Police departments of any State, District, Territory, Possession or subdivision thereof.
(3) Public officers in the executive, legislative or judicial branches of the government of the United States, or any State, District, Territory, or Possession or subdivision thereof who are actively engaged in the performance of official duties.

§ 1863. Exclusion or excuse from service
(b) Any class or group of persons may, for the public interest, be excluded from the jury panel or excused from service as jurors by order of the district judge based on a finding that such jury service would entail undue hardship, extreme inconvenience or serious obstruction or de-

At the hearing, defendants' counsel conceded that the key man method of juror selection is not illegal per se;[10] that there was no intentional or unintentional discrimination against or exclusion from the jury pools of any person or class of persons on account of race, religion, political affiliation or ethnic derivation; that there was no bad faith on the part of either the Clerk or the Jury Commissioner; and that there was no intentional or purposeful discrimination against or exclusion of any person or class of persons for any reason whatsoever. They contend, however, that the "necessary effect" of the procedures followed was "substantial" imbalance in the jury pools with respect to age, sex, geographical distribution and educational attainment. On the basis of the statistical analysis prepared by their experts, they allege that the grand juries which indicted them were drawn from pools which underrepresented young adults, women, the residents of certain counties, and the lesser-educated. They argue that, because of these disparities, the indictments must be dismissed as a matter of law.

lay in the fair and impartial administration of justice.

By Court order entered pursuant to 28 U.S.C. § 1863(b) the following classifications of persons were excluded from jury service in this District while actively engaged in the practice of their professions: physicians, surgeons, dentists, veterinarians, nurses, pharmacists, attorneys-at-law, school teachers, funeral directors, and ministers of the Gospel.

9. The record discloses that approximately 3500 names of prospective jurors were obtained from the key men, or about twice the total of 1700 jurors desired for both Divisions. Of these, 917 names were placed in the Southern Division jury wheel and 822 names were placed in the Northern Division jury wheel.

10. In Mobley v. United States, 379 F.2d 768, 773 (5th Cir. 1967), the Court of Appeals for the Fifth Circuit made it clear that it did not in Rabinowitz declare the key man system illegal as such. And see Pope v. United States, 372 F.2d 710, 724 (8th Cir. 1967); United States v. Cohen, 275 F.Supp. 724, 736–737 (D.Md. 1967).

There has been no shortage of cases in which defendants have attacked the composition of a jury panel because of alleged underrepresentation of various groups in the community. In the course of these cases, certain principles have become clear. Until the enactment of the Jury Selection and Service Act of 1968,[11] Congress had not prescribed any particular method of jury selection in the federal courts. The method to be used in any particular court has rested "largely in the sound discretion of the trial court and its officers under the guidance of the pertinent statutes." Pope v. United States, supra, 372 F.2d at 723; Dow v. Carnegie-Illinois Steel Corp., 224 F.2d 414, 427 (3d Cir. 1955), cert. denied, 350 U.S. 971, 76 S.Ct. 442, 100 L.Ed. 842 (1956).[12] There is a presumption that jury officials discharged their duties properly. Pope v. United States, supra, 372 F.2d at 723; United States v. Austrew, 190 F.Supp. 632, 634 (D.Md. 1961), aff'd per curiam, 317 F.2d 926 (4th Cir. 1963); United States v. Valentine, 288 F.Supp. 957 (D.P.R. Aug. 20, 1968). The burden of proving illegal discrimination or exclusion is upon the defendants. Whitus v. State of Georgia, 385 U.S. 545, 550, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); Glasser v. United States, 315 U.S. 60, 87, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Pope v. United States, supra; United States v. Cohen, supra, 275 F.Supp. at 740. However, it is not necessary for defendants to show that they are members of an excluded group or that the alleged imbalance actually prejudiced them. They may complain of disparities in the jury pool even though the composition of the particular grand jury drawn from the questioned pool is "unexceptionable." Thiel v. Southern Pacific Co., 328 U.S. 217, 225, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); Rabinowitz v. United States, supra, 366 F.2d at 37 n. 1, 59 (5th Cir. 1966); Dow v. Carnegie-Illinois Steel Corp., supra, 224 F.2d at 422; United States v. Dennis, 183 F.2d 201, 216 (2d Cir. 1950), aff'd 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).[13]

Other uncontroverted principles may also be adduced from the decided cases. The jury must be "a body truly representative of the community." Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940). It must be "drawn from a cross-section of the community." Thiel v. Southern Pacific Co., supra, 328 U.S. at 220, 66 S.Ct. at 985; Glasser v. United States, supra, 315 U.S. at 86, 62 S.Ct. 457; Mobley v. United States, 379 F.2d 768, 771 (5th Cir. 1967). This does not mean, however, that the jury must mirror the community. Proportional representation of all the various groups and classes of persons in our society is mandated neither by the Constitution nor by federal law. Swain v. State of Alabama, 380 U.S. 202, 205–209, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Cassell v. State of Texas, 339 U.S. 282, 286, 70 S.Ct. 629, 94 L.Ed. 839 (1950); Thiel v. Southern Pacific Co., supra; Gorin v. United States, 313 F.2d 641, 644 (1st Cir.), cert. denied, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052 (1963); United States v. Flynn, 216 F.2d 354, 388 (2d Cir. 1954), cert. denied, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955). But it does mean, at least, that there must not be a "systematic and intentional exclusion" of any group. Thiel v. South-

11. See n. 3, supra. The effective date of this Act is December 22, 1968.

12. As the law now stands, "Congress has laid down certain qualifications for Federal jurors, but it has never specified the sources from which the names of prospective jurors should be obtained, the methods by which these names should be selected, or the bases upon which otherwise qualified jurors should be eliminated from jury service." S.Rep. No. 891, 90th Cong., 1st Sess. 10 (1967). See also H.R. No. 1076, 90th Cong., 2d Sess. (1968), U.S.Code Cong. & Ad.News (9th Cong., p. 749).

13. Indeed, according to the analysis made by defendants' experts, the age, county of residence and educational attainment characteristics of the defendants Bryant were overrepresented on the grand jury which indicted them; the sex distribution was approximately equal.

ern Pacific Co., supra, 328 U.S. at 220, 66 S.Ct. 984; Glasser v. United States, supra; Gorin v. United States, supra, 313 F.2d at 644; Mobley v. United States, supra, 379 F.2d at 771. The applicable standards were authoritatively summarized by Mr. Justice Murphy in Thiel v. Southern Pacific Co., supra, 328 U.S. at 220, 66 S.Ct. at 985 as follows:

> The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. * * * This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury.

■■ It is true that in *Thiel*, as in most of the other cases in which jury selection procedures have been attacked, there has been clear evidence of deliberate, systematic and intentional exclusion of certain groups in constituting the jury pool, and some courts have held that, short of a showing of intent or design, defendants' motions must fail. United States v. Valentine, supra, 288 F.Supp. at 957; United States v. American Oil Co., 249 F.Supp. 130, 133, 138

(D.N.J.1965), motions for reconsideration denied, 253 F.Supp. 783 (D.N.J. 1966), 286 F.Supp. 742 (D.N.J.1968); United States v. Fujimoto, 102 F.Supp. 890, 895 (D.Hawaii), motion for leave to petition denied, 344 U.S. 852, 73 S.Ct. 102, 97 L.Ed. 662 (1952). However, it seems clear that proof of intentional discrimination is not an essential element of a defendant's case. The better view would seem to be that first expressed by Judge Biggs in Dow v. Carnegie-Illinois Steel Corp., supra, 224 F.2d at 424:

> [M]ore must be required of jury officials than merely that they not 'intentionally and systematically exclude' any groups. * * * [I]t must be the duty of jury officials, at least in the federal system, not to exclude any cognizable groups from jury lists through neglect as well as through intentional conduct.

Accord, Rabinowitz v. United States, supra, 366 F.2d at 57; Mobley v. United States, supra, 379 F.2d at 772; United States v. Cohen, supra, 275 F.Supp. at 740; United States v. Duke, 263 F.Supp. 828, 831 (S.D.Ind.1967).[14] Although it has not been necessary, up to the present time, for the Supreme Court to go further than to strike down jury pools where there has been "systematic and intentional exclusion" of an identifiable group, that Court seems plainly to have recognized that jury officials have an obligation to use selection processes which are reasonably designed to obtain an adequate cross-section representation of the community. Thus, in the above quotation from the *Thiel* case Mr. Justice Murphy said that "[t]he American tradition of trial by jury * * * necessarily contemplates an impartial jury drawn from a cross-section of the community" and that "[r]ecognition must be given to the fact that those eligible for jury service are to be found in every stratum of society." In Glasser v. United States,

14. In Rabinowitz v. United States, supra, 366 F.2d at 57, this proposition was put in positive form: "The Constitution and laws of the United States place an affirmative duty on the court clerk and the jury commissioner to develop and use a system that will probably result in a fair cross-section of the community being placed on the jury rolls."

supra, 315 U.S. at 86, 62 S.Ct. at 472, the same Justice observed:

> Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted. That the motives influencing such tendencies may be of the best must not blind us to the dangers of allowing any encroachment whatsoever on this essential right. Steps innocently taken may, one by one, lead to the irretrievable impairment of substantial liberties.

And in at least two cases the Court has voided convictions, even though there was no showing of intentional exclusion, where jury commissioners, who knew no qualified negroes, limited their selection of jurors to their own acquaintances. Hill v. State of Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); Smith v. State of Texas, supra; cf. Cassell v. State of Texas, supra, 339 U.S. at 290, 70 S.Ct. 629. As Mr. Justice Black wrote in Smith v. State of Texas, supra, 311 U.S. at 132, 61 S.Ct. at 166: "If there has been discrimination, whether accomplished ingeniously or ingenuously, the conviction cannot stand." The plain implication of these decisions must be that proof of intentional discrimination is not essential to a successful attack upon the composition of a jury pool, and that it is the duty of jury officials in selecting prospective jurors to use methods which are reasonably designed to obtain a pool in which each cognizable group in the community has substantial representation. The methods used must be such as reasonably to insure that each group has more than a mere token representation and has a real, if not a perfectly proportionate, chance to influence jury verdicts. Cf. United States v. Duke, supra, 263 F.Supp. at 834.

In the present cases defendants do not contend that the Jury Commission intentionally discriminated against or excluded from the jury pools any identifiable group. Nor do they attack the key

man system as such or point to any specific defect, either intentional or unintentional, in the methods employed by the Commission in selecting prospective jurors. But they do take the position that the percentage disparity between the representation of certain identifiable groups on the jury lists and the representation of these groups in the population as a whole requires the conclusion that the necessary result of the selection methods used was unlawful discrimination.

Admittedly, the statistical analysis prepared by defendants' experts does reveal an apparent underrepresentation of each of the groups or classes suggested. And, as the court stated in United States v. Cohen, supra, 275 F.Supp. at 742,

> [U]nexplained differences between the proportion of an identifiable group on a jury list of this District and in the total eligible population of this District must be examined to determine if such differences furnish any evidence of systematic exclusion by intentional or neglectful actions or non-actions by the Jury Commissioner or by this Court.

However, a careful analysis of the jury pools here under attack satisfies this Court that despite the statistical imbalances with respect to age, sex, geographical distribution and educational attainment, there was substantial representation of each of the groups claimed to have been underrepresented, and that the percentage variations between the composition of the jury pools and the population as a whole have been satisfactorily explained.

*Age.* According to the charts prepared by defendants' experts the apparent underrepresentation of the young adult was the most pronounced of the four disparities in question. Their figures reveal that in the Northern Division, there were 21 individuals who were between the ages of 21 and 29 at the time the pool was constituted; a representation proportionate to the population of the Division between these ages would have been 161. In the Southern Division,

there were 20 individuals between the ages of 21 and 29 in the pool; a proportionate representation would have been 147. Those in their thirties were also underrepresented in both Divisions, though to a considerably lesser degree. In the Northern Division pool there were 106 individuals in their thirties rather than a proportionate 171; in the Southern Division pool those in their thirties numbered 128 rather than a proportionate 188.

 This evident underrepresentation of the lower age brackets may be explained, to an indeterminable extent, by the fact that many young people, while absent from Maine for the service, school or other pursuits, continue to maintain a residence here. Accordingly, though they are unavailable for jury service, they still affect the population figures for their age group. In addition, young mothers, to whom jury service would represent a substantial hardship, would also be included in the lower age brackets. In any event, as noted in United States v. Cohen, supra, 275 F. Supp. at 740, "Classification of persons on a decennial age basis may well be significant for certain purposes, but it is certainly not required as an underlying jury selector principle." If one considers the number of individuals in the jury pools under the age of 40, it is clear that the representation of this group is substantially more than mere token representation. Furthermore, this Court is inclined to agree with a recent opinion of the Court of Appeals for this Circuit, in which Chief Judge Aldrich stated:

We regard it as highly speculative whether the decisional outlook of such excluded persons would be different than that of persons a mere few years older, or a few years younger. The mere fact that there might be fewer young persons on the jury, and fewer of the oldest, than the exact proportion of such persons existing in the community does not of itself make a jury nonrepresentative.

King v. United States, 346 F.2d 123, 124 (1st Cir. 1965). Accord, United States v. American Oil Co., supra, 249 F.Supp. at 135.

 *Sex.* The underrepresentation of women was somewhat less pronounced. The Northern Division pool was 67.2% male, 32.8% female (532 males and 260 females); a proportionate representation of the Division's population over 21 would have been 48.4% male, 51.6% female (384 males and 409 females). The Southern Division pool was 63.9% male, 36.1% female (587 males and 332 females); a proportionate representation would have been 48.5% male and 51.5% female (446 males and 473 females). There is no evidence of any deliberate discrimination against women, and no doubt a major cause of this disparity was the reluctance of the key men to suggest, and the Jury Commission to include in the pools, mothers of young children, who would have been excused if called. In any event, as the figures reveal, women were certainly substantially represented in the jury pool of each Division.[15]

*Geographical Distribution.* Defendants' experts found that, of the nine counties in the Southern Division, three were underrepresented by more than 20%. Androscoggin County had 98 residents in the jury pool; its proportionate share, based on its total population over 21, was 134. It was thus 26.9% underrepresented. Kennebec County had 103 rather than a proportionate 138 residents in the pool and was thus 25.4% underrepresented. York County was 23.2% underrepresented, having 119 rather than a proportionate 155 residents in the pool. In the Northern Division, only one of the seven

---

15. As the court observed in United States v. Duke, supra, 263 F.Supp. at 834:
By 'substantially represented' the Court means that it is very unlikely that a verdict would be rendered in this district without members of both sexes having an opportunity to influence the result.

In point of fact, the Southern Division grand jury in these cases consisted of 11 men and 12 women; the Northern Division grand jury contained 14 men and 9 women.

counties was underrepresented to a pronounced degree. Aroostook County had 100 residents in the pool while its proportionate share was 203, a 50.7% underrepresentation.

28 U.S.C. § 1865(a) provides,

Grand and petit jurors shall from time to time be selected from such parts of the district as the court directs so as to be most favorable to an impartial trial, and not to incur unnecessary expense or unduly burden the citizens of any part of the district with jury service. * * *

■ Those familiar with the geography of Maine will appreciate that Aroostook is the northernmost county in the State. Parts of it are more than 200 miles north of Bangor, where the Northern Division grand jury deliberates. Motivated by considerations of convenience and economy, the Clerk and Commissioner followed the practice, sanctioned by the 1960 Judicial Conference Report, 26 F.R.D. at 421, of selecting fewer than a proportionate number of prospective jurors from the northern reaches of Aroostook County. This sensible procedure, which was also followed to a lesser extent in constituting the Southern Division pool, was clearly justified under the statute. Katz v. United States, 321 F.2d 7, 8–9 (1st Cir. 1963); United States v. Cohen, supra, 275 F.Supp. at 741–742; see Thiel v. Southern Pacific Co., supra, 328 U.S. at 221, 66 S.Ct. 984.

■ Furthermore, although the residents of a particular county in this State may be "cognizable" in the sense that they constitute an identifiable and discrete group, the record is devoid of evidence that county residence is a meaningful classification for the purpose suggested. It has not, and probably cannot, be shown that residents of one county have a decisional outlook different from residents of another county. Cf. Gorin v. United States, supra, 313 F.2d at 644; Pope v. United States, supra, 372 F.2d at 723.

■ In light of the foregoing, it may be superfluous to add that each county was substantially represented in its Divisional pool. Nevertheless, this was the case.

■ *Educational attainment.* The findings of defendants' experts with respect to educational disparity were not broken down by Division. According to their study, 7% of the members of the two jury pools had attained an educational level of eighth grade or less, while the corresponding figure for the District's total population over the age of 25 was 36.4%. 83.7% of the members of the pools had a high school diploma, as against 43.2% of the population; 38.7% of the members had some post-high school training as against 14.1% of the population; and 18.1% of the members had received a diploma from a four-year college, as against 5.5% of the population. As defendants concede, the explanation for at least part of these discrepancies may be the literacy standard prescribed by law for federal jury service. 28 U.S.C. § 1861(2) (1964). See n. 8, supra. In any case, the representation of those without a high school diploma was certainly substantial.

■ In Swain v. State of Alabama, supra, 380 U.S. at 208, 85 S.Ct. at 829, the Supreme Court stated, "Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group." Similarly, in Gorin v. United States, supra, 313 F.2d at 644, the Court of Appeals for this Circuit observed that "[I]t has never been the law that a jury must represent a true cross-section of the community." In the present cases while defendants have shown certain disparities in the composition of the jury pools, they have not established that the failure of the jury selection system to provide statistical perfection resulted from the systematic exclusion, either intentional or unintentional, of any identifiable class or group of qualified persons in the community. Absent such a showing, they have not sustained their burden of

proving that the grand juries which indicted them were not in fact "drawn from a cross-section of the community."

In opposing these motions, the Government stresses that the totality or "universe" of citizens which the experts used in their computations was erroneously conceived. The hypothetical construct, with which the study compared the actual jury pools, was based on the total population of the Division 21 years of age and over (in the educational attainment category, the total population of the District 25 years and over), without any correction being made for the exclusions provided by law and by Court order.[16] Were this Court otherwise disposed to grant defendants' motions, it would be necessary to consider whether, and to what extent, this omission affected the validity of their findings. However, since the Court is inclined to deny these motions for the reasons indicated, such speculation is unnecessary.

On December 22, 1968, the Jury Selection and Service Act of 1968,[17] which substantially amends current federal jury selection law, will become effective. Under the new Act, the option to use the key man system will no longer be open. With certain minor exceptions, the Act provides that prospective jurors are to be selected at random from either the voter registration lists or the lists of actual voters within each District or Division. The new statute is a manifestation of Congress' continuing concern "[T]hat potential jurors will be selected at random from a representative cross section of the community and that all qualified citizens will have the opportunity to be considered for jury service." [18] That this concern is appropriate, of course, in no way reflects upon the validity of the procedures herein challenged. See United States v. Cohen, supra, 275 F.Supp. at 737–738, 739.

The motions to dismiss are denied.

It is so ordered.

16. See n. 8, supra.

17. See n. 3, supra.

18. H.R.Rep. No. 1076, 90th Cong., 2d Sess. 2 (1968), U.S.Code Cong. & Ad.News (90th Cong., p. 748).