STATE OF NEBRASKA, APPELLEE, V. CURTIS FOSTER,
APPELLANT.

242 N. W. 2d 876

Filed June 9, 1976. No. 40410.

Paul E. Watts, J. Joseph McQuillan, Gerald E. Moran, and Robert C. Sigler, for appellant.

Paul L. Douglas, Attorney General, and Melvin K. Kammerlohr, for appellee.

Heard before WHITE, C. J., SPENCER, McCOWN,

NEWTON, CLINTON, and BRODKEY, JJ., and KUNS, Retired District Judge.

BRODKEY, J.

A grand jury for Douglas County, Nebraska, returned an indictment against the defendant, Curtis Foster, charging that he "did unlawfully and knowingly or intentionally possess with the intent to distribute, deliver, or dispense a controlled substance, to wit: "Heroin." On February 6, 1975, he was arraigned and plead not guilty. Trial was had to the court on May 15, 1975, defendant having waived a jury trial; and the court convicted Foster of the offense. On September 16, 1975, the court sentenced him to imprisonment in the Nebraska Penal and Correctional Complex for a period of 5 years. He has now appealed his conviction to this court. We affirm.

In his appeal, Foster alleges only two grounds which he claims require reversal of his case. He first alleges that there was insufficient evidence to support the findings and judgment of the trial court; and, secondly, that he was deprived of due process of law by the failure of the court to sustain his motion to quash his indictment which he claims was invalid because Nebraska's method of grand jury selection systematically excluded 19 and 20 year old voters from service.

We discuss these assignments of error in the order in which appellant has presented them. An undercover narcotics officer, Charles Cramer, testified that on the nights of December 3 and 5, 1974, he made heroin purchases at Foster's home in Omaha, Nebraska, from one Cecil Bradshaw, an old army friend of Fosters, who at that time was living with Foster and his wife. Although the testimony presented at the trial was conflicting, the agent, Officer Cramer, testified that on December 3, he and Bradshaw went to the Foster residence, arriving at approximately 9:30 p.m. The house was locked, and the two waited outside until Curtis Foster and his wife,

Claudette, and his brother, Irwin Foster, returned home. Cramer testified that he sat down in the livingroom, while Curtis and Irwin went into Bradshaw's room, a bedroom located at the southwest corner of the house. Bradshaw asked Cramer what he wanted to buy, then went into the southwest bedroom, and returned with a packet containing a substance that was later analyzed and determined to be heroin. On December 5, Bradshaw and Cramer again went to Foster's house; and, according to the officer, Curtis Foster talked to him in the livingroom, while Bradshaw went into the southwest bedroom. Bradshaw returned approximately 10 minutes later carrying a plate with yellow powder on it and asked Cramer to follow him into the basement. In the basement, Cramer rejected the powder, indicating he wanted "the same stuff" he had purchased on December 3. They returned upstairs, and Cramer testified that he then told Curtis Foster that "this wasn't the same stuff I bought last time and I didn't want it." Cramer testified that Foster replied, "There is a mixup. I will straighten it out," and that Foster then followed Bradshaw into the southwest bedroom. Curtis Foster returned alone; and, according to Cramer, a conversation ensued concerning various "cutting agents." Bradshaw then came out of the hallway and asked Cramer to return to the basement with him. He did so, and a sale of a substance, later found to be heroin, was completed.

Irwin Foster, the brother of Curtis, denied being in Bradshaw's room on either occasion and claimed that he was in his own bedroom located next to Bradshaw's on the south side of the house. Curtis Foster denied having any knowledge of Bradshaw's activities in dealing with drugs. He testified that on December 3, he and his wife, and his brother, had just returned from shopping when they admitted Bradshaw and Cramer into the house, that he went into his own room in the northwest corner of the house to put some parcels away, returned

to the livingroom, and then went back to his room to change his clothes. He said he was not in Bradshaw's room that evening. Both Curtis Foster and his wife denied the conversation about cutting agents testified to by Cramer.

Foster contends that the evidence is insufficient to show that he had "possession" of the controlled substance, or that he had the requisite intent to deliver.

The rule is that evidence the accused had physical or constructive possession of a drug with knowledge of ·its presence and its character as a controlled substance is sufficient to support a finding of possession. State v. Shimp, 190 Neb. 137, 206 N. W. 2d 627 (1973); State v. Faircloth, 181 Neb. 333, 148 N. W. 2d 187 (1967). Although the evidence is clearly sufficient to establish that Bradshaw had actual possession of the drugs in question, there does not appear to be any direct evidence that Foster was ever in actual possession of the drugs. His possession, if at all, was constructive possession. Constructive possession may be proved by direct or circumstantial evidence, and may be shown by the accused's proximity to the substance at the time of the arrest or by a showing of dominion over the substance. State v. Morford, 192 Neb. 412, 222 N. W. 2d 117 (1974); State v. Faircloth, *supra*; State v. Shimp, *supra*.

In the instant case, there is evidence that Cecil Bradshaw was staying in Curtis Foster's house and occupied the southwest bedroom. According to the testimony of Officer Cramer, Foster was present with Bradshaw while Bradshaw prepared to bring the drugs to Cramer. There is evidence from which the court could conclude that Foster had sufficient control or dominion over the heroin to be able to assist Officer Cramer in obtaining an exchange of the unsatisfactory heroin for other heroin that was acceptable, and that he did so. There was also sufficient evidence in the record from which the court might well have found that Bradshaw did not have exclusive control over the heroin, although it was appar-

ently kept in his bedroom; and that Foster, in whose home the drugs were kept, had more than a passive relationship with those drugs.

Foster contends that there was insufficient evidence of an intent to deliver. We disagree. The evidence reveals that Foster was a party to Bradshaw's delivery preparations; and that he and Bradshaw went to the southwest bedroom to exchange the heroin, immediately after Foster's statement to Cramer, "There is a mixup. I will straighten it out." Foster's conduct at that time is relevant and referable to an intent on his part to deliver the heroin to Cramer, which occurred shortly thereafter.

Moreover, it appears that the evidence adduced was ample to establish under section 28-201, R. R. S. 1943, that Foster aided and abetted Bradshaw in his sale and delivery of the drugs to Cramer. Aiding and abetting involves some participation in the criminal act or involves some conscious sharing in the criminal act, as in something that the accused wishes to bring about, in furtherance of a common design, either before or at the time the criminal act is committed, and it is necessary that he seeks by his action to make it succeed. State v. Alvarez, 189 Neb. 276, 202 N. W. 2d 600 (1972). Foster's conduct satisfies the above criteria, and that being so, under section 28-201, R. R. S. 1943, he "may be prosecuted and punished as if he were the principal offender." We are unable to ascertain from the record in this case whether Cecil Bradshaw was charged or convicted for his activities arising out of the facts of this case; and, if so, for what offense. In any event, this would not foreclose the prosecution and conviction of Foster as an aider and abettor under section 28-201, R. R. S. 1943. The law is well established under that section that the conviction of the principal is not necessary for conviction of an aider and abettor, and that, in fact, it is not even necessary that the identity of the principal be established. State v. Alcorn, 187 Neb. 854, 194 N. W. 2d

798 (1972); Pigman v. United States, 407 F. 2d 237 (8th Cir., 1969).

In this case, the trier of fact was the court, rather than a jury. We have held that where a law action is tried to the court without a jury, the finding of the court has the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. Siefford v. Housing Authority, 192 Neb. 643, 223 N. W. 2d 816 (1974); First Nat. Bank of Omaha v. First Cadco Corp., 189 Neb. 734, 205 N. W. 2d 115 (1973). This court has adopted the rule in criminal cases that the verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the State, to support it. State v. Lacy, 195 Neb. 299, 237 N. W. 2d 650 (1976); State v. Fowler, 193 Neb. 420, 227 N. W. 2d 589 (1975). There was "substantial evidence, taking the view most favorable to the State" to support the verdict of the court in this case.

We now consider Foster's claim that the trial court erred in failing to quash the indictment against him because the indictment was returned by a grand jury which, he asserts, was composed in a manner prohibited by the due process clause of the Fourteenth Amendment to the Constitution of the United States. As late as 1969, the statutes of Nebraska required that a grand or petit juror must be over the age of 25 years and under the age of 70 years. § 25-1601, R. R. S. 1943. In 1969 the Legislature amended the language of that section to provide that such jurors must be over the age of 21 years and under the age of 70 years. § 25-1601, R. S. Supp., 1974. That minimum age requirement has been in effect from 1969 until the present date. In support of his position, appellant points out that under section 38-101, R. R. S. 1943, all persons under 19 years of age are declared to be minors. This provision of the statute is contained in the article dealing with guardianship of minors. This provision has been

changed from time to time. See, for example, § 38-101, R. S. Supp., 1969.

Appellant argues that the present statutes permitting only individuals above the age of 21 to serve on grand or petit juries amounts to a deliberate and systematic exclusion of an entire class of 19 and 20 year old voters, depriving him of his right to due process of law and rendering the indictment returned by that grand jury void. The law is well established that the systematic exclusion of a class of persons from jury service is unconstitutional. Peters v. Kiff, 407 U. S. 493, 92 S. Ct. 2163, 33 L. Ed. 2d 83 (1972). In Peters, which involved the exclusion of negroes from jury service, the court pointed out that the Sixth Amendment guarantee of a jury in criminal prosecutions comprehends a fair possibility for obtaining a representative cross-section of the community on the jury and stated: "When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable." The same rule was applied in Taylor v. State of Lousiana, 419 U. S. 522, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975), which involved the exclusion of women from jury service. By analogy, appellant argues that in Nebraska the exclusion of the 19 and 20 year old age group from jury service is likewise unconstitutional. To determine the validity of appellant's claim, it is first necessary to determine whether the 19 and 20 year old individuals comprise a "well-defined class of citizens" or a "cognizable group"; and, if so, whether the class was arbitrarily excluded from jury service.

It has been held that for purposes of jury challenges, a group to be "cognizable" must have a definite composition, must have members who share common attitudes or ideas or experience, and must have a community of interest which cannot be adequately protected by the rest of the populace. United States v. Guzman, 337 F. Supp.

140 (S.D.N.Y., 1972), affirmed, 468 F. 2d 1245 (2d Cir., 1972), cert. den. 410 U. S. 937, 93 S. Ct. 1937, 35 L. Ed. 2d 602 (1973). See, also, United States v. Test, 399 F. Supp. 683 (Colo., 1975); Test v. United States, 420 U. S. 28, 95 S. Ct. 749, 42 L. Ed. 2d 786 (1975). Similar criteria have been applied to various age groups on several occasions by federal courts. In every instance, except one which involved the exclusion of persons between the ages of 21 and 34 [United States v. Butera, 420 F. 2d 564 (1st Cir., 1970)], the courts have found that the specified age groups were not a cognizable class. See, e.g., United States v. Lewis, 472 F. 2d 252 (3d Cir., 1973); United States v. Geelan, 509 F. 2d 737 (8th Cir., 1974); United States v. Duncan, 456 F. 2d 1401 (9th Cir., 1972); United States v. Guzman, *supra*. The above cases, with the exception of United States v. Butera, *supra*, involved a statutory exclusion from jury duty of persons between 18 and 20 years of age. The United States Supreme Court has recently alluded to the question of whether "the young" are an identifiable group, but has not resolved the issue. Hamling v. United States, 418 U. S. 87, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974).

As pointed out by the court in United States v. Guzman, 337 F. Supp. 140: "Among any age group there will be vast variations in attitudes, viewpoints, and experiences. The fact that two persons are the same age does not necessarily give them a community of interest. And although we hear much talk of the 'generation gap,' it is impossible to define that gap with any precision, as the defendant has tried to do." Our conclusion is that the 19 and 20 year olds excluded from jury service in Nebraska do not constitute a cognizable class of "the young" and their interests and attitudes are adequately represented by the 21 year olds and other young people who are permitted to serve. Nor do we believe that the exclusion of those 19 and 20 years of age is arbitrary. Many in that age group undoubtedly attend college or other schools, making jury service in-

convenient. Moreover, a higher level of maturity or education may arguably result from setting the age minimum at 21 years of age. Nor is the lower minimum voting age of 18 years any indication of discrimination or exclusion, as different qualities may be required for voting than for jury service. See United States v. Duncan, *supra*. We conclude, therefore, that the exclusion of the 19 and 20 year old group from service on juries does not render the Nebraska jury selection procedure unconstitutional, nor did it deprive appellant of his constitutional right to due process of law. The court was correct in overruling the motion to quash the indictment.

The judgment of the trial court is affirmed.

AFFIRMED.