UNITED STATES of America,
Plaintiff-Appellee,

v.

James Dean POTTER,
Defendant-Appellant.

No. 76–1590.

United States Court of Appeals,
Ninth Circuit.

April 26, 1977.

Rehearing and Rehearing En Banc
Denied June 14, 1977.

Michael D. Bebow, argued, Leonard W. Goldstein, Sausalito, Cal., for defendant-appellant.

Lawrence J. Semenza, U. S. Atty., Reno, Nev., Philip M. Pro, argued, Asst. U. S. Atty., Las Vegas, Nev., for plaintiff-appellee.

Before WRIGHT and WALLACE, Circuit Judges, and BURNS,* District Judge.

BURNS, District Judge:

Appellant (Potter) was convicted of importing marijuana in violation of 21 U.S.C. §§ 952(a) and 960(a)(1). He claims error as to two rulings by the District Court. The first was a refusal to dismiss the indictment because of discrimination in the selection of the grand jury, and the second was a denial of the motion to suppress evidence garnered in a search of Potter's airplane.

I. GRAND JURY CHALLENGE

The Jury Selection Act of 1968, 28 U.S.C. § 1861 et seq., establishes as a national policy the right of all litigants to have grand (and, of course, trial) juries selected at random from a fair cross-section of the local community. Section 1863 of the Act mandates the use of voter registration lists or lists of actual voters as the primary

* The Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation.

source of jurors, but requires the use of other sources of names where necessary to insure a fair cross-section. Section 1867 sets forth the mechanics for challenge and provides for a stay of proceedings or dismissal of the indictment whenever there is a substantial failure to comply with the provisions of the Act.

■ "There is no requirement that a grand jury be a statistical mirror of the community, *United States v. DiTommaso*, 405 F.2d 385, 389 (4th Cir. 1968), or that it conform to proportionate strength of each identifiable group in the total population, *Simmons v. United States*, 406 F.2d 456, 461 (5th Cir. 1969)", *United States v. Gast*, 457 F.2d 141, 142 (7th Cir.), *cert. denied*, 406 U.S. 969, 92 S.Ct. 2426, 32 L.Ed.2d 668 (1972), but "any substantial deviations must be corrected by use of supplemental sources." S.Rep.No.981, 90th Cong., 1st Sess. at 17 (1967).

Pursuant to the amended plan of the United States District Court for the District of Nevada (Southern Division) [1] for the random selection of grand and petit jurors, in 1972, 7,436 names were selected at random from the voter registration lists. In October, 1974, 2,112 names were selected from among the 7,436 names and questionnaires were mailed to these individuals. Of the 2,112, 1,449 questionnaires were returned to the Clerk of the Court. The grand jury which indicted Potter was selected from among the 1,449 individuals who returned questionnaires. Appellant's expert compiled figures gleaned from 311 questionnaires, selected at random from the 1,449 returned questionnaires.[2] This, together with Census Bureau and voter registration statistics, produced the following information. 41.2% of the general adult population of the Division was between the ages of 18 and 34. Persons between the ages of 18 and 34 comprised 29.7% of the voter registration list and 28.6% of the random sample of the jury wheel. 75.1% of the general adult population had an education of high school or below, while only 53.1% of the jury wheel sample had a high school education or less. Blacks comprised 8.5% of the general population in the District, but made up only 5.8% of the sample.

■ Potter contends these disparities must be remedied by supplementation of the voter registration lists with other sources.[3] However, before the absence of a fair cross-section is established and corrective measures are required, appellant must establish a substantial deviation with respect to a cognizable group. We do not reach the question of whether systematic exclusion is required or has been established in this case. *Cf. United States v. Ross*, 468 F.2d 1213 (9th Cir.); *cert. denied*, 410 U.S. 989, 93 S.Ct. 1500, 36 L.Ed.2d 188 (1973); *Carmical v. Craven*, 457 F.2d 582 (9th Cir. 1971), because we find that the appellant has failed to meet his burden of establishing cognizability or substantiality of deviation.

■ A precise definition of what constitutes a cognizable group is lacking in the decided cases, nor do we believe a static, fixed definition is desirable.[4] Because the Act requires "a fair cross section of the community in the district or division wherein the court convenes" cognizability will necessarily vary with local conditions. Thus, for instance, variations in geographi-

---

1. Nevada is actually a single judicial district without divisions. 28 U.S.C. § 108. However, the Jury Plan for the District of Nevada, promulgated pursuant to 28 U.S.C. § 1863, divides Nevada into a Northern and Southern Division. (Plaintiff's Ex. No. 1). The Southern Division consists of five counties in the southern part of the state.·

2. The government does not challenge the validity of the sample thus selected by Potter's expert.

3. In this regard, appellant points to the supplemental use of four other sources—dog licenses, welfare rolls, utility turnons and turnoffs and property tax rolls—used by the state court for Clark County (Las Vegas and environs) because, he claims, of the infirmities of a panel drawn solely from the voter registration list.

4. For a thorough review of the cases, see the appendix to Judge Goldberg's opinion for the Fifth Circuit in *Foster v. Sparks*, 506 F.2d 805 (5th Cir. 1975).

cal representation, either between counties or between rural and urban areas, may be significant in some districts and not in others.

The cognizability requirement is generally said to derive from *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), in which the Supreme Court held:

Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection. Whether such a group exists within a community is a question of fact. When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated  .   .   .

The petitioner's initial burden  .   . was to prove that persons of Mexican descent constitute a separate class in Jackson county, distinct from "whites." Id. at 478, 74 S.Ct. at 670–671.

In *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), the Supreme Court stated that systematic exclusion of economic, social, religious, racial, political and geographical groups in the community would violate the cross-sectional requirement.

Further insight into the cognizable-group—cross-sectional requirement may be found in a case holding women may not validly be excluded from service on federal juries:

The thought is that the factors which tend to influence the action of women are the same as those which influence the action of men—personality, background, economic status—and not sex. Yet it is not enough to say that women when sitting as jurors neither act nor tend to act as a class. Men likewise do not act as a class. But, if the shoe were on the other foot, who would claim that a jury was truly representative of the community if all men were intentionally and systematically excluded from the panel? The truth is that the two sexes are not fungible; a community made of exclusively of one is different from a community composed of both; the subtle interplay of influence one on the other is among the imponderables. To insulate the courtroom from either may not in a given case make an iota of difference. Yet a flavor, a distinct quality is lost if either sex is excluded. The exclusion of one may indeed make the jury less representative of the community than would be true if an economic or racial group were excluded. *Ballard v. United States,* 329 U.S. 187, 193–94, 67 S.Ct. 261, 264, 91 L.Ed. 181 (1946).

■ Thus, the essence of the cognizability requirement is the need to delineate an identifiable group which, in some objectively discernible and significant way, is distinct from the rest of society, and whose interests cannot be adequately represented by other members of the grand jury panel.

■ We may approach this determination from several perspectives. Looking at it through the eyes of the group in question, the presence of some internal cohesion is significant.

The group must have cohesion. There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience which  .   .   . cannot be adequately represented if the group is excluded from the jury selection process.  .   .   . The group must have a community of interest which cannot be adequately protected by the rest of the populace.

*United States v. Guzman,* 337 F.Supp. 140, 143–44 (S.D.N.Y.), *affirmed,* 468 F.2d 1245 (2d Cir.), *cert. denied* 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973).

Viewed in another way, community attitudes are important in delineating a cognizable group. *Cobbs v. Robinson,* 528 F.2d

1331 (2d Cir.), *cert. denied* 424 U.S. 947, 96 S.Ct. 1419, 47 L.Ed.2d 354 (1976). We must consider whether a particular class is in fact thought of as an identifiable group by the larger community. *Quadra v. Superior Court of the City and County of San Francisco*, 403 F.Supp. 486 (N.D.Calif.1975). In assessing this factor, the fact of prejudice or community discrimination against the group would clearly be significant, *Hernandez v. Texas, supra, Cobbs v. Robinson, supra*, because of its tendency to defeat the concept of an impartial grand jury. *Cobbs v. Robinson, supra*.

■ We turn now to an application of these considerations to the groups in issue here. As appellant concedes, there is sparse support for his contention that "young people," i. e. those 18 through 34, are a cognizable group for purposes of the Act. Numerous courts have reached a contrary conclusion. *E. G., United States v. Olson*, 473 F.2d 686 (8th Cir.), *cert. denied*, 412 U.S. 905, 93 S.Ct. 2291, 36 L.Ed.2d 970 (1973) (18–20 not cognizable); *United States v. Kuhn*, 441 F.2d 179 (5th Cir. 1971) (21–23 not cognizable); *United States v. Gast*, 457 F.2d 141 (7th Cir.), *cert. denied*, 406 U.S. 969, 92 S.Ct. 2426, 32 L.Ed.2d 668 (1972) (18–26 not cognizable); *United States v. Briggs*, 366 F.Supp. 1356 (N.D.Fla.1973) (21–29 not cognizable). The sole case recognizing an age group as cognizable is *United States v. Butera*, 420 F.2d 564 (1st Cir. 1970), which involved the age group 21–34.

In *United States v. Ross, supra*, we held that the age group 21–24 did not constitute a cognizable group. Appellant attempts to distinguish this and other like cases on the basis that the age group in question here (18–34) is much larger than that found in any other case except *Butera*. We do not find this to be a meaningful distinction. We do not believe the age group 18–34 is any less heterogenous or has any more in common than does an age grouping spanning fewer years, nor does it share any

interests which cannot be effectively represented by others. As we noted in *Ross*, "There appears to be no factor other than age which defines this group [the young], and we can perceive no reason to arbitrarily single out a narrow group of 'young persons' as opposed to 'middle-aged' or 'old' persons for purposes of jury service." 468 F.2d at 1217. While some may consider "young people" as a distinct group, and some may even look upon them with disfavor (rather than favor, or neutrality), there is clearly no community agreement regarding the age range to be included in the category "young people." We conclude there is no cognizable "magic" about a group whose sole identifiable characteristic is that each member is in the age range of 18–34.

We reject also appellant's contention that the less educated (high school or less) are a cognizable group. *Butera* is the only case supporting this viewpoint. The less educated, like the young, are a diverse group, lacking in distinctive characteristics or attitudes which set them apart from the rest of society.[5] They are of varying economic backgrounds, and races, and of many different ages. We believe the interests of this group can be adequately protected by the remainder of the populace.

It is clear that race is a cognizable factor. § 1862 of the Act expressly prohibits exclusion of citizens from jury duty "on account of race, color, religion, sex, national origin, or economic status." However, appellant has failed to establish that blacks are substantially underrepresented on the grand jury venire. Neither the Act nor its legislative history provides much assistance in determining what constitutes a substantial deviation. Congress expressly left "the definition of substantial to the process of judicial decision." S.Rep.No.981, 90th Cong., 1st Sess. at 17 (1967).

■ We have concluded that in determining the meaning of "substantial" we should look to people and not percentages. Cf.,

---

5. Indeed, we would be reluctant to embrace a position that education is limited to formal education.

*United States v. Armsbury*, 408 F.Supp. 1130, 1138 (D.Or.1976). That is, we consider the effect of the deviation on the absolute numerical composition of grand juries.

.Reliance solely on percentages may produce disproportionately high figures which distort the actual effect of the deviation. In the instant case, appellant's figures tended to show that whereas blacks represented 8.5% of the population, their representation on the jury wheel was only 5.8%. Thus, superficial analysis suggests that blacks are underrepresented by 31.9%, which by itself seems substantial. But to focus on that percentage figure alone is to focus on a misleading statistic. While 2.7 is 32% of 8.5, it is still only 2.7% of 100. Correction of this deviation would result, on the average, in the addition of less than one person on a grand jury of 23, and would add just one black to an array of 50. The absolute percentage disparity would have to be approximately 4.3% to result in the addition of one black to the average grand jury. Here the deviation is only 2.7%. This is not substantial.

We do not suggest that a 4.3% deviation should automatically result in a finding of substantiality.[6] We simply say that, as a method of analysis, courts should consider the effect of fully proportional representation on an average grand jury. In a case in which the deviation is greater than that found here, the interplay between cognizability and substantiality may be important. For example, the significance of political affiliation may vary from locality to locality, as may the distinctness of various ethnic groups. Where the group in question shares many common attitudes and is considered to be distinct by others, a smaller deviation may destroy the presence of a fair cross-section than would be the case with a group which is less clearly defined.

## II. SEARCH AND SEIZURE CHALLENGE

At about 3:00 P.M. on October 23, 1974, a Beech D–18 aircraft, registration number N224G, occupied by Potter and a Robert Short, was observed at El Paso International Airport by U. S. Customs agents. Later that day, at about 6:40 P.M., a customs aircraft followed N224G as it took off and flew southeasterly toward the Mexican boundary. About seven minutes after take off, N224G turned off its navigation lights and then began descending from its altitude of about 2,000 feet. Its descent continued until, when crossing the border, its altitude was about 100 feet. The agents followed this aircraft about 150 miles into Mexican air space.[7] Customs agents, after calculating how long it would take N224G to reach its projected destination in Mexico and return to the United States, placed the Holtville, California, radar unit on alert for the period between 3:00 and 5:00 A.M. on October 24, 1974. At about 3:10 A.M. the Holtville unit detected an aircraft about 53 miles south of the border travelling northward within Mexico. It crossed the border about 25 minutes later. No flight plan had been filed. The Holtville radar station did not detect any other airplanes crossing the border between midnight and 8:00 A.M.

The aircraft was monitored continuously by either the Holtville or Palmdale radar units from 3:10 A.M. until it disappeared from radar about 5:10 A.M. It was also followed[8] by a U. S. Customs aircraft at

---

**6.** In *United States v. Goff*, 509 F.2d 825 (5th Cir. 1975), an underrepresentation of 1.4 persons on a 23-person grand jury was found to be not substantial.

**7.** Although it was nearly dark at the time of border crossing, the agents were able to follow the plane by ordinary human vision for a short distance in Mexico. From a location of about 20 miles inside Mexico, the agents followed N224G by means of a Forward Looking Infra Red (FLIR) device. This device projects an image of the followed aircraft onto a screen in the cabin of the customs aircraft, permitting surveillance during darkness.

**8.** The word "followed" is used in the sense that the customs aircraft flew a course which, according to radar, placed it about one mile behind the aircraft which had crossed over from Mexico. (Radar had two "blips" on the screen.) It was not "locked on" to the aircraft by means of FLIR, since this plane did not have that device aboard.

about a distance of one mile from shortly after it crossed the border until it disappeared from the radar screen. At the time N224G disappeared from radar, the customs plane was then about 35 miles west-southwest of Las Vegas. At 5:30 A.M., an aircraft reappeared on radar, identified itself as N224G for approach to McCarran Airport in Las Vegas, and shortly thereafter landed. The customs plane landed at McCarran at 7:05 A.M. A search of N224G by customs agents approximately one-half hour later turned up marijuana and three aircharts. Following its impoundment, the aircraft was searched on October 30, 1974, in San Diego, and a cassette tape was seized.

We conclude that the initial search of the aircraft was valid. Potter concedes, as he must, that a search by customs agents may be made without either probable cause or a warrant, where the search occurs at the functional equivalent of the border. *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). The search of an aircraft arriving at an inland city airport after a non-stop flight from Mexico would clearly be the functional equivalent of a border search. 413 U.S. at 273, 93 S.Ct. 2535.

In order to support a conclusion that a search occurred at the functional equivalent of a border we have required that there be "articulable facts to support a reasonably certain conclusion . . . that a vessel has crossed the border and entered our [territory]," *United States v. Tilton*, 534 F.2d 1363, 1366 (9th Cir. 1976), and that any contraband which is uncovered in the search was aboard the vehicle, vessel or aircraft when it entered the United States. *Alexander v. United States*, 362 F.2d 379 (9th Cir. 1966). Continuous surveillance is not required. *United States v. Solmes*, 527 F.2d 1370 (9th Cir. 1975).

While reasonable certainty is a higher standard than that of probable cause, it does not rise to the level of proof beyond a reasonable doubt. What is re-

quired is that "the totality of the facts and circumstances within the officers' knowledge and of which they have reasonably trustworthy information be sufficient in the light of their experience to warrant a *firm* belief that a border crossing has occurred." (Emphasis not supplied.) *United States v. Tilton, supra*, at 1366–67.

Here, although the agents could not have been absolutely certain, we conclude that the totality of the facts and circumstances were sufficient to warrant "a firm belief" in the minds of the customs agents that the aircraft which entered the United States at 3:35 A.M. on October 24 was N224G; that its first stop inside this country was McCarran Airport; and that the marijuana and aircharts discovered must have been aboard when the aircraft crossed the border.

The October 30, 1974, search which produced the cassette tape stands on a slightly different footing. In light of *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), this search was probably a valid inventory search following the impoundment of N224G for narcotics and customs violations. However, we need not decide this question since it does not appear from the record that the tape was introduced into evidence or that any use was made of it. Furthermore, there has been no showing that appellant has been or could have been prejudiced by any use of the tape in evidence. If there was error, it was harmless.

Affirmed.